# IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 7 |
| | : |
| COVENANT PARTNERS, L.P. | : |
| | : |
| DEBTOR | : BANKRUPTCY NO. 14-17568 SR |
| | : |

# OPINION

BY:  STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE.

*Introduction*

The Trustee of the above estate has filed a Motion to Approve a Compromise with the Securities and Exchange Commission (SEC) under Bankruptcy Rule 9019. The Motion is opposed by Creditors FCF Credit, Inc., Tripartite LLC and Peter Frorer (the "Objecting Creditors"). A hearing on the Motion was held October 21, 2015. For the reasons which follow, the Motion will be granted.[1]

*Proposed Compromise*

The Trustee seeks to resolve a dispute over the Proof of Claim filed herein by the SEC. The SEC asserts an unliquidated monetary claim for violations of federal securities laws. The Trustee and the SEC have agreed to settle the claim for approximately $5.8 million. The agreement initially recited that within 14 days from the filing of his Final Report the Trustee would disgorge the settlement amount to the SEC. That term has been deleted

---

[1] Because this matter pertains to allowance or disallowance of a claim against the estate, it is within this Court's "core" jurisdiction. *See* 28 U.S.C. § 157(b)(2)(B) (including among core proceedings such causes of action)

*Background*

The Debtor is a private equity fund formed as a limited partnership. *See* Private Offering, Ex. A to Objection. The Debtor's general partner (Covenant Capital Management Partners, or CCMP) is itself a limited partnership. *Id.* CCMP's general partner is CCM, Inc., the stock of which is wholly owned by William B. Fretz, Jr. and John P. Freeman (together, the Principals, or Messrs. Fretz/Freeman). *Id.* Accordingly, and for all intents and purposes, Messrs. Fretz and Freeman controlled the Debtor and the related entities.

Beginning in 1999 the Debtor sold limited partnership interests to investors. All told, they raised approximately $7.3 million from 58 limited partners. *Id.* Ex. B (Cease and Desist Order). In or around 2013, the Financial Industry Regulatory Association (FINRA) investigated the Principals and Keystone Equities Group, Ltd (Keystone), a broker-dealer which the Principals also controlled. *See* Motion, Ex. A (Offer of Settlement). As a result of that investigation the Principals were stripped of their securities licenses and Keystone's SEC registration was terminated. After FINRA made its findings, the SEC commenced a parallel investigation into the Debtor's affairs. Transcript of Hearing, October 21, 2015, T- 5.

On September 19, 2014, the Debtor commenced this Chapter 7 bankruptcy case. Three days later the Trustee was appointed. The next day the SEC ordered the Debtor, its general partner, and the Principals to cease and desist operations. *See* Objection, Ex. B. Soon after his appointment, the Trustee became engaged in negotiations with the SEC regarding its investigation and the amount of its claim. T-5. The SEC had determined that, after an initial period during which the Debtor operated legitimately, its Principals began a pattern of misappropriation of investor funds. *See* Objection, Ex. B,

2

p. 2. This misconduct took three forms: diversion of investor funds to the broker-dealer Keystone, self-dealing on the Principals' part, and the improper payment of performance fees. *Id.* pp 4-7. The Trustee and the SEC ultimately reached a settlement of the agency's claim. It is this proposed compromise which the Trustee seeks to have the Court approve.

*Applicable Standard*

Under Bankruptcy Rule 9019, the Court has authority to approve a compromise of a claim, provided that the debtor, trustee and creditors are given twenty days' notice of the hearing on approval of the compromise or settlement. *See* B.R. 2002(a)(3), 9019(a). Such notice has been provided.

Approval of a settlement lies within the sound discretion of the Bankruptcy Court. *In re Neshaminy Office Bldg. Assoc.*, 62 B.R. 798, 803 (E.D.Pa.1986). In deciding whether to approve a settlement, the Court must determine whether the proposed settlement is in the best interests of the estate. *Id.* The Third Circuit has held that this particular process of bankruptcy court approval requires the Court to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal. *See In re Martin*, 91 F.3d 389, 393 (3d Cir.1996). Following *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d 1 (1968), the Third Circuit has identified four criteria for courts to consider in striking this balance: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, together with the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *See*

*Martin, supra; see also Will v. Northwestern University (In re Nutraquest, Inc.*), 434 F.3d 639, 645 (3d Cir.2006) (reaffirming *Martin* factors for approval of settlements). Interpretative decisions counsel that when considering the relevant factors the court should avoid second-guessing the Trustee in the exercise of his or her business judgment, but rather should endeavor to ascertain whether the terms of the Trustee's proposed settlement fall below the lowest range of reasonableness. *See Neshaminy, supra* at 803. As the proponent of the settlement, the Trustee bears the burden of proof. *See In re Glickman Berkovitz, Levinson & Weiner*, 204 B.R. 450, 455 (E.D.Pa.1997).

*Arguments*

In a written response the Objecting Creditors make three arguments against approval of the compromise: first, that the SEC is receiving preferential treatment vis-à-vis other similar creditors; second, that the limited partners of the Debtor are effectively receiving a distribution before creditors in violation of the absolute priority rule; and third, that the settlement is not in the best interests of creditors. At oral argument, the Objecting Creditors added a contention that the Trustee's investigation into the SEC claim was insufficient because there was no indication that the Trustee reviewed the Debtor's partnership agreement to determine whether the conduct of Messrs. Fretz and Freeman was improper; and because there had been no formal examination of the Principals to determine if they have assets which the Trustee might attach on behalf of the estate. T-9, T-10. The Court will address these arguments as they relate to the four-pronged analysis set forth in the Third Circuit's *Martin* decision.

*Probability of Success*

The Trustee was the only witness to testify at the October 21, 2015 hearing. The Trustee sees little chance in reducing the SEC Claim to an amount below $5.8 million. He gave his opinion that, had the SEC declined to settle, its claim could be as high as $9 million. T-6. The Trustee testified that his conclusion was based on an investigation into relevant financial records aided by special counsel. *Id.* To that end, the Trustee and counsel examined records obtained from the broker-dealer Keystone, from the Debtor itself, and from the defendants in a pending avoidance action.[2] Motion ¶ 11. These records consisted, *inter alia*, of a note payable from Keystone, the Debtor's bank statements, records obtained from the defendant in the avoidance action, the Debtor's private offering documents, and records related to performance fees taken by the Debtor's Principals in 2009 and 2010. *Id.* Having evaluated this evidence, the Trustee concluded that the SEC's case was strong.[3] T-7. The Trustee testified that in his opinion the SEC litigation would be "impossible to win" and that further attempts even to reduce the SEC claim would be an "uphill battle." T-8, T-38. The Trustee's testimony on all issues was unrebutted. Other than brief cross-examination of the Trustee the Objecting Creditors offered no evidence, despite being expressly offered the opportunity to do so.

The Objecting Creditors dispute the premise upon which the SEC claim is based. They maintain that there is a lack of proof that what the Principals did was illegal. T-10. They contend that the Debtor's partnership agreement is needed to determine this fact, but that this document is not part of the record. T-12. They also complain that the

---

[2] The Trustee has sued one of the Objecting Creditors, Peter Frorer, and other creditors to avoid and recover stock the Principals are alleged to have transferred for inadequate consideration. See generally, Adv. No. 14-685, *Trustee v. Frorer, et al.*
[3] The other factor that the Trustee considered was a statute of limitations challenge to part of the SEC claim. This factor was used in his negotiations with the SEC. T-7.

5

Trustee does not know what assets Messrs. Fretz and Freeman have which might be recovered for the estate. T-18. On these bases, they argue that the Trustee lacks the information necessary to determine whether the SEC claim should be allowed at all.

The Court dismisses these arguments. Leaving aside the fact that it would be a strange Partnership Agreement indeed that would authorize conduct of the sort complained of here, the Debtor's Partnership Agreement governs the relationship between the Debtor and its limited partners. The SEC's claim is based on violations of federal securities law. Specifically, the Debtor was found[4] to have violated § 17(a) of the Securities Act,[5] § 10(b) and Rule 10b-5 of the Exchange Act.[6] Sanctions for those violations are set forth in § 8A of the Act[7] and § 21C of the Exchange Act.[8] The Trustee's findings following his investigation were consistent with the SEC's findings. To reiterate, together with special counsel the Trustee reviewed a multitude of relevant books and records belonging to the Debtor and to Keystone, the broker-dealer to which the Principals improperly transferred investor funds from the Debtor. This inquiry into the underlying facts is undisputed. Moreover, the records examined would seem logically to be those which would have revealed the improper transfer of assets. They would also have ostensibly been the records which would have disclosed whether the Principals paid themselves improper performance fees. The critical information, in other words, was most likely to be found in the records which the Trustee and counsel are acknowledged to have examined, and not necessarily the entities' Partnership

---

[4] *See* Objection Ex. B, Cease and Desist Order, 2.
[5] 15 U.S.C. § 77q(a)
[6] 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5
[7] 15 U.S.C. § 77h-1(e), (g)
[8] 15 U.S.C. § 78u-3(a)

Agreement. The Court thus finds no fault with the sufficiency of the Trustee's investigation.

Neither is it of paramount importance that the Trustee might have recourse against the Principals or others for the wrongdoing at issue. That question no doubt has relevance in the Trustee's overall administration of this estate. The pivotal question for present purposes, however, is the likelihood of the Trustee winning a litigation with the SEC or reducing its claim below $5.8 million. Attachable assets of the Principals would not determine whether the SEC claim was potentially worth $9 million, as the Trustee feared. What mattered was the Principals' conduct and whether the Trustee could win the SEC litigation. The Trustee concluded, as had the SEC, that the Principals had misappropriated funds in violation of federal securities law and, consequently, that the estate was likely to lose if it litigated the matter. The record reflects that the Trustee conducted an appropriate investigation and made an informed decision based on the facts adduced. The Court reiterates that there is *no* evidence to the contrary. Strident speculation about a better litigation result carries little probative weight here, particularly when there is no evidence offered to support it.[9] Put differently, the settlement clearly satisfies the *Martin* "range of reasonableness" test.

*Complexity of the Litigation*[10]

Moreover, even were the chances of success in the litigation not remote, the Trustee would have to litigate issues which he characterized as "intricate and complex." T-8. The Court will not second guess that assessment. It appears reasonable. The

---

[9] On this score the Court notes that Objecting Creditor, Peter Frorer, has a separate financial stake in the outcome of this contested matter and stands to benefit if the SEC claim is eliminated and the Trustee's avoidance action against him fails.

[10] As this compromise proposes to settle a claim *against* the estate and does not provide for affirmative recovery on the estate's behalf, ability to collect is not implicated. The Court thus passes to the third prong of the *Martin* analysis.

Court observes that the claim is comprised of three components: first, the Principals' improper transfers of investor funds to the broker-dealer Keystone; second, transfer of the Debtor's stock in the company Pet360 to satisfy personal debts; and third, the Principals' payment to themselves of performance fees during down years. Determining the validity of each component would require consideration of a wide variety of evidence. In the case of transfers to the broker-dealer, the Trustee would have need to attempt a reconciliation of the Debtor's books and records with those of Keystone. He would also have to consider the propriety of the promissory note which Keystone subsequently gave the Debtor, because the timing of the note was apparently suspicious.[11] In determining whether performance fees were justified, the Trustee would need to analyze the Debtor's accounting and tax records for years prior to 2009 and 2010 to determine if losses remained on its books. Finally, valuation of the stock which the Principals transferred to Peter Frorer to satisfy personal loans would typically require input from an expert. *See In re Colonial Realty, Inc.*, 226 B.R. 513 (Bankr.D.Conn.1998) (requiring expert testimony on valuation of stock transferred to determine if reasonably equivalent value received in exchange for the stock). Considering all of this, the Court finds no fault with the Trustee's conclusion that there are "a lot of moving parts" to the SEC's claim. T-8

---

[11] In the Cease and Desist Order, the SEC explained that "[a]fter years of accepting payment from the [Debtor] without documentation and without making any interest or principal payments to the Debtor, Keystone executed a purported Promissory Note dated December 31, 2010 for [$1.4 million] at a 10% annual interest rate." Objection, Ex. B, ¶ 20. The note was to be paid in a lump sum on December 31, 2012. *Id.* This note was not disclosed to the Debtor's limited partners. *Id.*

*Best Interests of Creditors*

Given the questionable prospects for a successful challenge to the SEC claim and the complexity of the issues, the Trustee is of the opinion that it would be an imprudent use of the estate's very limited resources to try to reduce it further. Thus, he concluded that the proposed compromise is in the best interest of the Estate's creditors. Here again, the Court will not second guess that business decision. In the opinion of the Court it passes muster under the *Martin* guidelines. Moving beyond this, however; the Objecting Creditors also argue that the settlement is not in the best interest of creditors because it grants the SEC priority status in relation to other unsecured creditors, and because the payment to the SEC is effectively paying equity holders (i.e., the Debtor's limited partners) before creditors in violation of the absolute priority rule. *See* Objection, pp. 9-10. The Court disagrees on both counts.

*Alleged Priority Treatment*
*of the SEC Claim*

First in a reply brief, then in a supplement filed shortly before the hearing, and yet again on the record at the hearing, the Trustee made abundantly clear that the SEC's claim would *not* enjoy an advantaged status. Under the agreement, the SEC will hold a general unsecured claim in the approximate amount of $5.8 million. *See* Reply, 2; T-7 – T-8. The figure represents funds subject to disgorgement as well as about $300,000 in interest. T-8. The claim is to have the same priority and share equally with other general unsecured claims in any distribution from the bankruptcy estate.

*The Decision to Settle,*
*Subordination, and Absolute Priority*

The Objecting Creditors also argue that the contemplated disgorgement of funds to the SEC will violate principles of subordination and the absolute priority rule. Objection 10-12.

A similar scenario was presented to the Bankruptcy Court in *In re Adelphia Communications Corp.*, 327 B.R. 143 (Bankr.S.D.N.Y.2005) *aff'd* 337 B.R. 475 (S.D.N.Y.2006) That Court's discussion is helpful. In that case, the Debtor had reached a settlement with the SEC to resolve securities claims. Under the settlement, the Debtor was to pay the SEC $715 million to be placed in a victims' restitution fund. Unsecured creditors objected and argued that the SEC would pay defrauded investors more from the fund than they would otherwise receive under the Debtor's plan. The *Adelphia* Court recognized that investors might receive different treatment depending on whether their claim was paid by the SEC or under a plan; however, that issue was not before the Court:

> But here equity holders and defrauded noteholders would not be sharing in assets of the estate under a plan, or in a chapter 7 liquidation. Rather, they would be sharing in a fund to be created and owned by the Government, sharing in assets the Government would be obtaining as a consequence of the totality of its bargaining power in this case—which bargaining power in turn derives from the DoJ's indictment power, the DoJ's forfeiture power, and the SEC's ability to bring an enforcement action and to file and recover on a proof of a claim.
>
> Thus, while defrauded equity holders will plainly have to confront the Absolute Priority Rule and section 510(b) when trying to share in assets of the estate *in this Court,* what I am asked to approve here is twice removed from that scenario. Not only does this motion not involve a reorganization plan contemplating a distribution to equity; it does not even

10

> involve an objection to the SEC's claim, or the merits of the Creditors' Committee adversary proceeding, with its related subordination issues. Rather it is a 9019 motion, raising the fundamentally different issues, under the standards discussed at pages 158-159 above, as to whether controversies—one (but only one) of which is differences in views as to how the SEC's proof of claims would be dealt with at such time as its allowability and priority were litigated—should be compromised.

327 B.R. at 168-169 [emphasis in original]. The complexity of the issue, the *Adelphia* Court went on, made the decision to settle all the more reasonable:

> Whether the SEC's claim would have been allowed under these circumstances, and/or subordinated, is a matter of fair debate. The issue is one that bankruptcy judges, practitioners and scholars have discussed amongst themselves for some time, without a definitive answer. So far as I am aware, the issue is, for all practical purposes, one of first impression.
>
> But while the issue of the allowability or subordination of the SEC claim, when and if litigated, is a close and difficult one, it is not the issue I have to determine here. And indeed, the very difficulty of the underlying issue makes the wholly different issue before me—whether a settlement of such a controversy is inappropriate or unlawful—a rather easy one. The real issue before me, of course, is whether the Government and the Debtors could settle a controversy as to which that close and difficult issue is an element, and the answer to that plainly is "yes." It is no different than the multitude of other difficult issues that are settled in litigation all the time.

*Id.* at 169.

There are obvious similarities between *Adelphia* and the instant case. Here, as in *Adelphia*, there is no proposal now before the Court to pay equity holders or defrauded investors from assets of the bankruptcy estate. Rather, and as in *Adelphia*, the Trustee is proposing to settle litigation with the SEC and liquidate its claim. Any funds ultimately disgorged to the SEC would belong, in the first instance, to the SEC. Any payments

11

later made by the agency to others would be subject to the SEC's own rules and regulations governing claims and restitution. In other words, the absolute priority argument in this Court is, as it was in *Adelphia*, premature.

Granted, matters are not quite as attenuated here as in *Adelphia*. The settlement here does provide for allowance of the SEC disgorgement claim, a question the *Adelphia* Court determined was not ripe in that case. But that distinction does not alter the fact that there is at present no proposal by the Trustee to distribute estate funds to equity investors and thereby prefer them to unsecured creditors. Moreover, insofar as subordination of the SEC's claim is concerned, the Court recognizes, as did the *Adelphia* Court, the existence of "fair debate," and the absence of controlling authority on this point.  The Court agrees with the Trustee and others, however, that the better view is that the provisions of 11 U.S.C. § 510(b) do not apply to the allowance of a disgorgement claim to the SEC. On this particular point the Trustee argues that

> [c]ourts confronted with the issue where creditors object to settlements with the SEC on the ground that the government is likely to distribute the disgorged fund to equity security holders who could not ordinarily take ahead of the objecting creditors in a plan of reorganization or distribution in light of the absolute priority rule, observe that the premise may be correct but the conclusion does not follow. *See Ad hoc Adelphia Trade Claims Comm. v. Adelphia Commun. Corp.*, 337 B.R. 475 (SD NY) [*sic*] and *In re Adelphia Communs. Corp.* 327 B.R. 143 (S.D.N.Y. 2005). As the *Adelphia* court noted, any payments from the restitution fund would be from "a fund to be created and owned by the Government," not a distribution of assets of the debtors' estates as part of a plan of reorganizations. They therefore would not come within the language of Sections 510(b)… of the Code. 337 B.R. at 478. Moreover, as the *Adelphia* court further noted, if the debtor had rejected the government's proposal and the government succeeded in forfeiting its assets, the government's interest in the assets would have been superior to those of the creditors in any case. *Id*.

Trustee's Reply Brief, 3-4.

The Objecting Creditors simply disagree with the foregoing analysis. To be sure, *if* the Trustee were to eventually propose payment of estate funds to defrauded investors (some of whom have already filed unsecured claims), that may very well raise absolute priority issues. The Court acknowledges that possibility, but as in *Adelphia*, that is not the issue now before the Court. Just as in *Adelphia*, the issue *sub judice* is whether the proposed compromise of the SEC claim by the Trustee satisfies the requirements of Bankruptcy Rule 9019. The Court holds that it does.

*Summary*

The unrebutted evidentiary record supports the Trustee's proposed compromise. The Objecting Creditors have offered *no* evidence which undercuts that and their arguments as to the insufficiency of the Trustee's investigation are unfounded. The evidence establishes that the compromise is well within an appropriate range of reasonableness and otherwise satisfies the *Martin* criteria. The Trustee has met his burden of proof and the relief sought will be granted.

An appropriate Order follows.

By the Court:

_____
Stephen Raslavich
United States Bankruptcy Judge

Dated:  December 2, 2015